IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 





NO. 3-90-002-CV





TEXAS DEPARTMENT OF MENTAL HEALTH AND MENTAL RETARDATION,



 APPELLANT


vs.





OPAL PETTY, BY AND THROUGH HER NEXT FRIENDS,


AND LINDA KAUFFMAN AND HERBERT CLINTON DENSON,


AS NEXT FRIENDS OF OPAL PETTY,



 APPELLEES



 




FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT



NO. 428-321-A,, HONORABLE HARLEY CLARK, JUDGE 



 




 Opal Petty, through her "next friends" Herbert Clinton
Denson and Linda Kauffman, sued the Texas Department of Mental
Health and Mental Retardation to recover damages for personal
injuries that Ms. Petty allegedly suffered as a result of the
negligence of Department employees. Ms. Petty recovered a judgment
against the Department in the amount of $250,000. Both the
Department and Ms. Petty appeal. We will affirm the trial-court
judgment.



THE CONTROVERSY



 In 1934, the State committed Opal Petty, on her father's
petition, to the Austin State Hospital. She was then age 16. She
remained in the hospital until 1971, when the authorities
transferred her to the San Angelo State School, an institution for
the mentally retarded. Ms. Petty remained in the State School
until 1985 when authorities "furloughed" her to a foster home,
then, four months later, to the home of her niece and nephew, Linda
Kauffman and Herbert Clinton Denson.

 At the time of her commitment to the State Hospital in
1934, physicians diagnosed Ms. Petty as "hebephrenic
schizophrenic."[1] During the 37 years that followed, however,
hospital employees gave various appraisals of Ms. Petty's
condition, ranging from mentally ill to not mentally ill, and from
mildly mentally retarded, to moderately mentally retarded, to not
mentally retarded at all.

 While Ms. Petty alleged numerous misdeeds and omissions
on the part of hospital personnel, she complained basically that
she was wrongfully confined because she was neither mentally ill
nor mentally deficient and did not receive any meaningful hearings
on her continued commitment; and, she complained that the long
period of "confinement" without "commonly accepted psychiatric
care, treatment, . . . therapy," or training deprived her of living
skills she had before being institutionalized, as well as skills
that she would have developed but for her confinement. Allegedly,
the only "therapy" Ms. Petty received during her years at the State
Hospital was 35 years of work in the hospital laundry at a salary
of $ 2.00 per week. Ms. Petty also complained of the failure of
State Hospital employees to help her obtain work outside the
hospital or otherwise attempt to "restore her to a useful life in
society."

 The authorities transferred Ms. Petty from the State
Hospital to the State School in San Angelo in 1971, following a
diagnosis of mental retardation that Ms. Petty alleged was
erroneous. Ms. Petty made substantially the same factual
allegations regarding her 14-year residence from 1971 until 1985 in
the San Angelo State School as she did about her period in the
State Hospital, i.e., that her involuntary confinement was
unlawful, and that "unreasonable restraint" and "lack of treatment"
prevented her from realizing her developmental potential. 

 Ms. Petty pleaded, and the jury found, that Ms. Petty
suffered injury as a result of the negligence of agency personnel
"consider[ing] only their use or misuse of . . . treatment/
habilitation plans, mental status exams, tests, evaluations,
diagnoses, interdisciplinary team staffing reports, [and] progress
notes." 

 The trial judge limited Ms. Petty's recovery to injuries
resulting from negligence occurring after January 1, 1970, the
effective date of the Texas Tort Claims Act, Tex. Civ. Prac. & Rem.
Code Ann. § 101.001-.109 (1986 & Supp. 1991) ("the Act"); see
§ 101.061 of the Act.

 The jury found Ms. Petty's damages to be $ 505,000, and
the trial court reduced the damage award to $ 250,000 in accordance
with the limit established in § 101.023(a) of the Act.


GOVERNMENTAL IMMUNITY 



 Because the Department is an entity of the State, within
the doctrine of governmental immunity, Ms. Petty was obliged to
establish legislative consent to suit, see Missouri Pacific R. Co.
v. Brownsville Nav. Dist., 453 S.W.2d 812, 813 (Tex. 1970), Hosner
v. De Young, 1 Tex. 764, 769 (1847), and a legislative waiver of
immunity from liability. Missouri Pacific, 453 S.W.2d at 813.[2] 
 The legislature has expressly consented to suit in
§ 101.025(b) of the Act ("A person having a claim under this
chapter may sue a governmental unit for damages allowed by this
chapter."). The legislature has expressly waived immunity from
liability, in § 101.025(a), "to the extent of liability created by"
the Act. The waiver extends to the following injuries described in
§ 101.021:


 (1) property damage, personal injury, and death
proximately caused by the wrongful act or omission or the
negligence of an employee acting within his scope of
employment if:


 (A) the property damage, personal injury, or
death arises from the operation or use of a
motor-driven vehicle or motor-driven
equipment; and


 (B) the employee would be personally liable to
the claimant according to Texas law; and


 (2) personal injury and death so caused by a condition or
use of tangible personal or real property if the
government unit would, were it a private person, be
liable to the claimant according to Texas law.



(Emphasis added).


 In order to place her claim within the statute, Ms. Petty
was obliged to prove, by a preponderance of the evidence, the
elements of common-law negligence plus an additional element--that
the negligence alleged involved "a condition or use of tangible
personal . . . property." See § 101.021 of the Act; Salcedo v. El
Paso Hosp. Dist., 659 S.W.2d 30, 33 (Tex. 1983).

 In the present case, the trial court submitted Question
2 to the jury as follows:


 From 1970 through 1985, was the negligence, if any, of
any agency personnel a proximate cause of any injury to
Opal Petty?


 For the purposes of question 2 only, in determining
negligence, if any, of agency personnel, consider only
their use or misuse of medical records, staff meeting
results, interdisciplinary team staffing reports,
progress notes, individualized treatment/habilitation
plans, mental status exams, tests, evaluations and
diagnoses.


The jury answered "yes" with respect to the use by agency personnel
of individualized treatment/habilitation plans, mental-status
exams, tests, evaluations, diagnoses, interdisciplinary team-staffing reports, and progress notes. They answered "no" regarding
any use of medical records and staff-meeting results. 

 In its first point of error (subpoint A), the Department
contends the trial court erred in submitting question 2 to the jury
and in failing to disregard the jury's answer to that question and
to Question 14, a related question about damages, because, the
Department contends, the individualized treatment/habilitation
plans, mental-status exams, tests, evaluations, diagnoses,
interdisciplinary team-staffing reports, and progress notes are not
"tangible personal property" within the meaning of § 101.021(2) of
the Act. The Department does not complain of the jury's finding
that Ms. Petty sustained an "injury."

 The Department relies on Robinson v. City of San Antonio,
727 S.W.2d 40 (Tex. App. 1987, writ ref'd n.r.e.). In Robinson,
the plaintiff alleged that a police officer's failure to arrest
Mr. Robinson, after Mrs. Robinson called and requested help during
a domestic crisis, constituted misuse of a protective order that a
district court had issued. The San Antonio Court of Appeals held
that the protective order was not tangible property within the
meaning of the Act; it was, rather, a written memorial of a
decision and pronouncement of a district court, and the fact that
it had been reduced to a tangible writing did not make it tangible
property within the meaning of § 101.021(2). Id. at 43.

 By analogy to Robinson, the Department argues that the
various items listed in Question 2 are not "tangible personal
property," but simply written memorials by employees of their
intellectual observations and decisions concerning Ms. Petty:

 (1) The "individualized treatment/habilitation plans"
merely record decisions, taken in Ms. Petty's case by the
interdisciplinary team, concerning the kind of treatment she should
receive.

 (2) The "mental status exams" administered to Ms. Petty
were simply interviews by psychiatrists that may or may not have
been reduced to writing.

 (3) The standardized tests[3] administered to Ms. Petty at
the state school and the test results were merely aids employed in
reaching decisions regarding her treatment.

 (4) The "evaluations" and "diagnoses" simply express the
subjective judgments reached and decisions taken by physicians in
Ms. Petty's case.

 (5) The "interdisciplinary team staffing reports" reflect
only the subjective judgments of mental-health professionals
regarding Ms. Petty's treatment.

 (6) The "progress notes" merely record the staff
employees' subjective observations of Ms. Petty.

 The Act does not define "tangible property." We are
bound, however, by the supreme court's rationale and interpretation
of the phrase in Salcedo, 659 S.W.2d at 33.[4] In Salcedo, the
plaintiff's husband died of a heart attack after his treating
physician had released him from a public hospital. The plaintiff
alleged that the physician and staff of the hospital "misused the
equipment and tangible property . . . by improperly reading and
interpreting the electrocardiogram graphs and charts produced by
such equipment." The supreme court held that the plaintiff's
pleadings alleged an injury caused by "the negligence of the
hospital district's employees in the use of tangible property" and
therefore stated a cause of action under the Act. Salcedo, 659
S.W.2d at 32-33.

 The Department attempts to distinguish the
electrocardiogram chart in Salcedo from the notes, reports,
evaluations, and diagnoses in the present case. The Department
argues that an electrocardiogram mechanically records tangible body
signals, i.e. the actions of the heart, while the papers in
Ms. Petty's case are mere "memorialization of human judgment and
decision-making." We cannot see any material distinction between
a physician's interpretation of the paper reflecting the impulses
of the heart in Salcedo and the employees' interpretation of the
papers reflecting Ms. Petty's responses to questions and the
staff's observations of her physical and emotional behavior. The
physician acted or failed to act on the basis of one paper in
Salcedo; the evidence shows that the employees in Ms. Petty's case
acted and failed to act on the basis of the various documents
mentioned above. We therefore hold, pursuant to Salcedo, that the
individualized treatment/habilitation plans, mental status exams,
evaluations, diagnoses, interdisciplinary team staffing reports,
and progress notes constitute tangible property within the meaning
of § 101.021(2) of the Act. 

 With respect to the standardized tests (the three
verbally administered I.Q. tests and the written achievement test),
we distinguish the "blank" tests from those which were in fact
administered to Ms. Petty.[5] We hold the latter are tangible
property within the meaning of Salcedo: the tests taken by
Ms. Petty recorded her answers to oral and written questions and
the test administrators' observations of Ms. Petty's behavioral
responses to oral instructions. We cannot distinguish these tests
from the electrocardiograph in Salcedo. With respect to the
"blank" tests, we need not decide whether they constitute tangible
property within the Tort Claims Act; the Department did not request
a jury question distinguishing between the two forms of tests.

 The Department raises another argument in point of error
1 (subpoint B). Even if the aforementioned items constitute
tangible personal property, the Department contends, "there was no
evidence to show a use of these items of property in a manner which
proximately caused" Ms. Petty's injury. The Department contends
that any injuries Ms. Petty suffered resulted from errors in
judgment by those who treated her; in the Department's view, the
articles of tangible property were merely incidental to the
transactions and not a proximate cause of any injury to Ms. Petty. 
See Lowe v. Texas Tech University, 540 S.W.2d 297, 301 (Tex. 1976)
(Greenhill, J., concurring). 

 We believe the issue is controlled by Salcedo. The
Salcedo court stated:



 [T]he proximate cause of the damages for death or
personal injury must be the negligence or wrongful act or
omission of the officer or employee acting within the
scope of his employment or office. The negligent
conduct, however, must involve "some condition or some
use" of tangible property under circumstances where there
would be private liability. 


Salcedo, 659 S.W.2d at 33 (emphasis added).

 The Supreme Court did not indicate that the word
"involve" should have any meaning other than its meaning in
ordinary usage:  "to roll up in itself so as to gather in, embrace,
or comprehend; to include." Webster's New International
Dictionary, at 1307 (2d Ed. 1950) (emphasis added). Thus, under
Salcedo, the tangible personal property itself need not be a
proximate cause of the injury; the use of such property need only
be involved or included in any act or omission by the employee
which the jury finds to be negligent and a proximate cause of the
injury. That the Legislature has reenacted the Act without
altering the language in § 101.021 waiving governmental immunity in
the case of "a condition or use" of tangible property indicates a
legislative adoption of the construction in Salcedo. Robinson v.
Central Texas MHMR Center, 780 S.W.2d 169, 171 (Tex. 1989).

 Jury Question 2 inquired whether the negligence, if any,
of agency personnel, considering use or misuse of the enumerated
items, was a proximate cause of Ms. Petty's injury. We hold the
question constituted a proper inquiry under § 101.021(2) of the Act
and Salcedo, 659 S.W.2d at 33; and, consequently, Ms. Petty was not
required to establish that a use or misuse of tangible property
itself proximately caused her injuries. Accordingly, we overrule
the Department's point of error 1(B).


 

False Imprisonment



 In its first point of error (subpoint C), the Department
contends the trial court erred in submitting Question 2 to the jury
(and in failing to disregard the jury's answer to that question and
to a related question on damages) because Ms. Petty's cause of
action was actually one for false imprisonment; thus her suit was
barred by governmental immunity, because § 101.057 of the Act
expressly excludes claims arising out of false imprisonment from
the scope of the statutory waiver of immunity.

 The elements of false imprisonment are (1) willful
detention, (2) without consent, and (3) without authority of law. 
Sears, Roebuck & Co. v. Castillo, 693 S.W.2d 374, 375 (Tex. 1985);
James v. Brown, 637 S.W.2d 914, 918 (Tex. 1982).[6]

 Ms. Petty indeed pleaded that her confinement was
willful, involuntary, and unlawful (because Department employees
failed to meet statutory and constitutional requirements for
involuntary confinement). Ms. Petty also pleaded that, "because of
[the] years of confinement, [she] retreated to stereotyped behavior
typically found in a person institutionalized in a prison-like
environment." Moreover, Jury Question 1 inquired whether Ms. Petty
"sustain[ed] any injury as a result of her confinement." 

 In addition to the elements of false imprisonment,
however, Ms. Petty alleged Department employees were negligent in
their treatment of her and in their failure to treat her. 
Ms. Petty pleaded that "[d]efendants . . . subjected [her] to a
continued pattern and course of treatment of unreasonable restraint
and lack of minimally adequate training or habilitation,"
preventing Ms. Petty from acquiring those skills which she would
have developed had she not been institutionalized. She pleaded
further that "[the] [d]efendants' negligence included their failure
to develop and supervise the development of . . . an appropriate
written individualized treatment plan and [their improper
supervision of the development and use of] that plan to provide
[Ms.] Petty with adequate treatment and habilitation."

 Section 101.057(2) excludes from the Act any claim
"arising out of assault, battery, false imprisonment, or any other
intentional tort . . . ." (Emphasis added). The emphasized phrase
implies that the exclusion applies only to intentional torts of
false imprisonment. The trial court did not submit that theory to
the jury and the judgment does not rest thereon. Rather, the
judgment rests upon the jury's answer to Question 2, which inquired
whether any negligence by Department personnel was a proximate
cause of injury to Ms. Petty. Thus, it is immaterial that the
negligence found by the jury, and any attendant injury, occurred in
the context of her confinement. Nothing in the Act indicates that
the Legislature intended to exclude from the waiver persons who are
negligently injured while in a state of confinement, whether lawful
or unlawful. We therefore overrule subpart C of the Department's
first point of error.


BROAD-FORM QUESTIONS



 In its second point of error, the Department contends the
trial court erred in submitting Question 2 to the jury and in
failing to disregard the jury's answer to Question 2. The
Department argues that the "question allows a finding of negligence
based on the use of the enumerated property by any one of several
hundred employees during a fifteen-year period without clearly
establishing proximate cause." We hold the Department failed to
preserve the point for appellate review. Tex. R. App. P. Ann.
52(a) (Pamph. 1991).

 To preserve the point, the Department was required to
object to the charge specifically on the grounds raised on appeal. 
See Tex. R. Civ. P. Ann. 274 (Supp. 1991). The only related
objection we find in the record is this:



 Defendants also complain that there is no notice of which
agency personnel Plaintiff seeks to hold liable over the
15 years in which the Texas Tort Claims Act is in effect. 
Such failure makes it impossible for a court of appeals
to determine whether there is sufficient evidence to
support a finding of negligence under this question. 
This question basically invites the jury to search and to
guess at and to just hang liability on some unknown
person and -- using -- doing some unknown thing at some
unknown time. 


 We find in the foregoing no complaint that Question 2 was
erroneous because it allowed the jury to find liability as to any
number of unnamed people without establishing proximate cause.
Rather, the objection appears to encompass two complaints: (1) that
the pleadings were deficient because they failed to give the
Department notice of the nature of the claims against it; and (2)
that the question invited the jury arbitrarily to assign negligence
to the Department without regard to the evidence. With respect to
the former contention, we believe the pleadings were sufficient.[7] 
The second contention is irrelevant because there is no evidence or
allegation that anyone except Department personnel, acting in the
scope and course of their employment, was involved in the
transactions upon which Ms. Petty recovered judgment.

 Because the Department failed to preserve the assigned
error for our review, we overrule its second point of error.



ACTUAL NOTICE



 Section 101.101(a) of the Act requires that a plaintiff
provide the State with written notice of any claim against it

 not later than six months after the day that the incident
giving rise to the claim occurred. The notice must
reasonably describe:


 (1) the damage or injury claimed;

 (2) the time and place of the incident; and

 (3) the incident.



Subsection (c) of § 101.101 provides that the notice requirements
of subsection (a) "do not apply if the governmental unit has actual
notice that death has occurred, that the claimant has received some
injury, or that the claimant's property has been damaged." 
(Emphasis added). The jury found that the Department had actual
notice of Ms. Petty's injury. Thus, Ms. Petty was not obliged to
provide the Department with written notice containing the three
elements specified in § 101.101(a).

 In its third point of error, the Department contends the trial
court erred in submitting Question 31, which inquired about actual
notice, because that question incorrectly instructed the jury about
the requirements of actual notice. The charge defined actual
notice as follows:



 "Actual notice" is having actual information or it is,
once a reason exists to make inquiry, information about
those things which a reasonably diligent inquiry and
exercise of the means of information at hand would have
disclosed. A governmental entity may have notice through
its officers, agents, representatives or employees.


 

 The Department asserts the definition is erroneous
because it did not require the jury to find that Department
personnel had knowledge of the time, place, and nature of the
injury as § 101.101(a) of the Act required. We reject the
argument.

 The relevant statute is not § 101.101(a) but
§ 101.101(c). The latter requires only that the governmental
entity have actual notice that "the claimant has received some
injury," and expressly states that "[t]he notice requirements
provided or ratified and approved by [Subsection (a)] do not apply
if the governmental unit has actual notice" of the injury. 
(Emphasis added). See also Bowling v. City of Port Arthur, 522
S.W.2d 270, 273 (Tex. Civ. App. 1975, writ ref'd n.r.e.).

 An interpretation that subsection (c) required a finding
that the government agency had notice of the time, place, and
nature of the injury would contradict the text of the statute. To
interpret the statute as the Department does would be to add to the
statute, through implication, elements not required by the
unambiguous text of subsection (c). We are forbidden to resort to
interpretation by implication when the legislative intent can be
gathered from a reasonable interpretation of the language of the
statute. Commonwealth of Massachusetts v. United N. & S.D. Co.,
168 S.W.2d 226, 229 (Tex. 1942).

 We hold that actual notice under § 101.101(c) need not
include actual notice of the "time, place, and manner" of the
injury. The trial court was obliged to submit only "such
instructions and definitions as shall . . . enable the jury to
render a verdict." Tex. R. Civ. P. Ann. 277 (Supp. 1991); Johnson
v. Zurich General Accident & Liability Ins. Co., 205 S.W.2d 353,
353-54 (Tex. 1947). Under this rule and our holding, the
definition of actual notice was not deficient because it failed to
include the elements of time, place, and manner of the injury which
are part of the written notice requirement of § 101.101(a) of the
Act.

 Our holding is consistent with the purpose behind the
actual notice requirement -- "to enable the [governmental entity]
to investigate while facts are fresh and conditions remain
substantially the same." City of Houston v. Torres, 621 S.W.2d
588, 591 (Tex. 1981). If government-agency personnel have actual
notice of an injury, they are necessarily in a position to inquire
as to the details of the time, place, and manner of the injury. In
the present case, the Department was in possession of Ms. Petty's
medical records and other case-history documentation. It was
therefore in a better position than Ms. Petty to glean information
about the particulars of her injuries.

 We overrule the Department's third point of error. 

 In its fourth point of error, the Department contends the
trial court erred in denying its motion for directed verdict and
for judgment notwithstanding the verdict because, "even if the
submission of question 31 was correct, the jury had no credible
evidence on which to base its finding of actual notice."

 We are instructed, in addressing no-evidence points of
error, to examine the evidence in the light most favorable to Ms.
Petty's claim, ignoring all contrary evidence and inferences. See
Powers & Ratliff, Another Look at "No Evidence" and "Insufficient
Evidence", 69 Texas L. Rev. 515, 522 (1991); Calvert, "No Evidence"
and "Insufficient Evidence" Points of Error, 38 Texas L. Rev. 361,
364 (1960). We may not hold the evidence legally insufficient
unless we are persuaded that a "vital fact may not reasonably be
inferred from the meager facts proved in the particular case." 
Calvert, at 365. 

 We disagree with the Department's contention that the
record evidence was so scant that the jury could not reasonably
have "inferred from the meager facts proved" that Department staff
were aware of some injury to Ms. Petty between January 1, 1970, the
effective date of the Tort Claims Act, and May 23, 1986, six months
after Ms. Petty's furlough from the San Angelo State School. 

 In support of its position that Department staff had
notice of some injury to Ms. Petty during the relevant time,
Ms. Petty invites our attention to defendant's exhibit 60, an
"interdisciplinary team staffing report" prepared in 1978 by
Delbert Mitchell, a social worker assigned to Ms. Petty's case at
the San Angelo State School. The report contains the following
reference: "Opal has a mental health commitment dated 5-6-34 which
is not a legal commitment to San Angelo Center. This was explained
to her to the extent that she was able to comprehend it. Her civil
rights were also explained to her in the same manner." 

 The Department rejoins by pointing to testimony showing
that notations in hospital records, indicating "illegal
commitment," were "commonplace in 1978 and [were] acted upon
through the recommitment process for all persons in question." The
Department argues that this testimony nullifies any reasonable
inference that the notation indicated injury. We disagree. The
jury were free to reject the nullification inference because it is
no more than a possible inference from the evidence. We cannot say
that it would have been unreasonable for the jury to conclude that
a notation that Ms. Petty's commitment "is not a legal commitment
to San Angelo Center" put the Department on notice of some injury
to Ms. Petty. In fact, we can hardly imagine clearer notice that
Ms. Petty had incurred a legal injury. A legal injury is an injury
giving a cause of action by reason of its being an invasion of a
plaintiff's legal right, even though the injury may not be
"practically harmful at the time" or may be "slight in comparison
to what may develop subsequently." See Zidell v. Bird, 692 S.W.2d
550, 555 (Tex. App. 1985, no writ). In the present case, the jury
could reasonably have inferred that the notation by Ms. Petty's
caseworker, in the 1978 report, that Ms. Petty's commitment in 1934 
was "not a legal commitment to San Angelo Center," indicated that
Department personnel, namely Mr. Mitchell, had notice of some legal
injury to Ms. Petty, i.e., the illegal confinement, regardless of
whether her behavior at that time indicated any symptoms of
"institutionalization syndrome."

 In light of the 1978 notation, we cannot say that the
evidence was legally insufficient to support the jury's finding
that Department employees had actual notice of Ms. Petty's injury
between January 1, 1970, and May 23, 1986. We overrule the
Department's fourth point of error.


 COMMENT ON THE WEIGHT OF THE EVIDENCE



 In its fifth point of error, the Department avers the
trial court erred in overruling its objection to the word
"confinement" in Jury Questions 1 and 14 because use of the word
constituted a comment on the weight of the evidence. The trial
court submitted Question 1 as follows:



 Did Opal Petty sustain any injury as a result of her
confinement?


Question 14, which inquired about damages, was preceded by the
following instruction:



 If, in answer to Question 2 . . ., you have found that
the conduct of . . . agency personnel . . . proximately
caused any injury to Opal Petty during her confinement,
then answer Question 14.



The Department contends the use of the word "confinement" in
Question 1 and Question 14 assumed as true a controverted fact--that there was an alternative placement for Ms. Petty that was less
restrictive than the State Hospital or the State School. By using
the word "confinement," the Department asserts, the trial court
characterized Ms. Petty's care as "restrictive" and "imprisoning"
and thus nudged the jury toward a finding of liability.

 Ms. Petty rejoins that the parties did not dispute
whether Ms. Petty was "confined" in the neutral sense of describing
her physical surroundings following her commitment.

 We do not believe the trial court's use of the word
"confinement" influenced the jurors' minds on the controlling
element of the interrogatory and amounted "to such a denial of [the
Department's] rights . . . as was reasonably calculated to cause
and probably did cause rendition of an improper judgment." See
Tex. R. App. P. Ann. 81 (Pamph. 1991); Texas Employers Ins. Ass'n
v. McKay, 210 S.W.2d 147, 148-49 (Tex. 1948); Russell v. Great
American Indemnity Co., 94 S.W.2d 409, 410 (Tex. 1936). 

 Courts use the word "confine" to indicate a restriction
on a person's ability to leave a specified area at will, but the
word does not always connote imprisonment. See American Casualty
Co. v. Horton, 152 S.W.2d 395, 399 (Tex. Civ. App. 1941, writ
dism'd), and Southern Surety Co. v. Diercks, 250 S.W. 755, 755-56
(Tex. Civ. App. 1923, writ ref'd). (In actions on insurance
policies covering illness which "confines the insured within the
house," the trial court did not err by instructing the jury that
"[c]onfinement to the house does not necessarily mean a constant
literal restraint within the house; and an occasional visit to the
office of her physician for treatment, or taking exercise and
walking as a part of the plaintiff's treatment would not
necessarily mean that she was not at such times confined.").

 We do not believe the use of the word "confinement" in
Question 1 amounted to an impermissible comment: the question
asked whether Ms. Petty was injured as a result of her confinement. 
The question does not assume any injury, the controlling factor. 
Nor do we believe use of the word "confinement" in the instructive
paragraph of Question 14 amounted to an impermissible comment on
the weight of the evidence. The relevant sentence instructed the
jury that they should answer the damages question (Question 14)
only if they found the conduct of any agency personnel "proximately
caused any injury to Opal Petty during her confinement." (Emphasis
added). The question did not assume that any injury resulted from
the confinement or that agency personnel were negligent in their
diagnoses or care of Ms. Petty. We therefore overrule the
Department's fifth point of error.


PROSPECTIVE-PAYMENT PROGRAM



 In its sixth point of error, the Department avers the
trial court erred by excluding evidence about the Department's
Prospective Payment Program, a program through which the Department
pays money to designated community centers on behalf of particular
clients. The Department pays $ 55.60 per day (or $ 20,294.00 per
year) to the Concho Valley Center for Human Advancement as
compensation for certain services that the Concho Valley Center
provides Ms. Petty. 

 In its "Answer to Plaintiffs [sic] Sixth Amended Original
Petition," the Department requested "as a means of setoff, credit
on any judgment rendered in this cause in the amount" the
Department has paid and expects to pay in the future to the Concho
Valley Center for Ms. Petty's care. In its offer of proof, which
the trial court "overruled," the Department elicited testimony from
its Deputy Commissioner for Mental Retardation Services. He
testified, in effect, that the Department has an agreement with the
Concho Valley Center whereby it pays the Concho Valley Center
$55.60 per day in return for the Center's providing certain
services to Ms. Petty.[8]

 On appeal, the Department avers the trial court
erroneously concluded that the collateral-source rule prohibited
the introduction of evidence of the payment plan. We need not
reach that issue because we hold that evidence of the payment plan
was not relevant to a material issue in the lawsuit, and was
therefore inadmissible. 

 The Department attempted to introduce evidence of the
payment plan in support of its plea for a set-off against damages
awarded Ms. Petty. A set-off is a defendant's counterdemand
against a plaintiff arising out of a transaction extrinsic of the
plaintiff's cause of action. Weisz v. Horton, 148 S.W.2d 219, 221
(Tex. Civ. App. 1941, writ dism'd judgm. cor.); 80 CJS Set-off and
Counterclaim, § 3, at 7 (1953). The Department could not raise
such a claim unless it had grounds for a suit against Ms. Petty. 
See Booth v. Chadwick, 154 S.W.2d 268, 272 (Tex. Civ. App. 1941,
writ ref'd). The state alleged no theory under which it had a
legal right to recover the relevant sums from Ms. Petty because she
was under a legal duty to pay them.[9] We therefore overrule the
Department's sixth point of error.



MS. PETTY'S CROSS-POINTS



DAMAGES LIMIT



 In her first cross-point of error, Ms. Petty contends the
trial court erred by limiting her recovery to $250,000 after the
jury found damages in the amount of $505,000. The trial court
reduced Ms. Petty's award pursuant to § 101.023 of the Act, which
limits the state's liability "to money damages in a maximum amount
of $250,000 for each person and $500,000 for each single occurrence
for bodily injury or death." Ms. Petty argues that, because her
injuries were caused by successive occurrences of negligence, each
of which further injured her, the State was liable for damages in
the amount of $250,000 for each act of negligence involving use or
misuse of tangible property, of which the jury found 12. 

 Ms. Petty relies on Goose Creek Consol. v. Continental
Cas. Co., 658 S.W.2d 338 (Tex. App. 1983, no writ). That case
posed the question of whether two fires which destroyed two schools
at two different times constituted a single "loss occurrence" if
they were caused by the same arsonist. The insurance policy in
Goose Creek defined "loss occurrence" as "the total loss by perils
insured against arising out of a single event." Goose Creek, 658
S.W.2d at 340. The court held that, where there are two fires at
two different places with two separate causal factors, there are
two "loss occurrences," regardless of whether the same arsonist
caused both fires. Id. at 341.

 Goose Creek is distinguishable from the present case. 
The two fires in that case were separate, there being no causal
connection between them. In the present case, on the other hand,
Ms. Petty alleged a single, ongoing, indivisible injury --"institutionalization syndrome" -- resulting from the totality and
orchestration of numerous negligent acts and omissions on the part
of Department employees over many years. Unlike the two separate
fires in Goose Creek, the negligent acts and omissions of
Department employees are not separable according to which caused a
particular part of Ms. Petty's total injury, and no evidence
purported so to distinguish her injuries.

 In order to recover the statutory limit for each
occurrence of negligence, Ms. Petty was required to present
evidence in such a fashion as would allow the jury to link
particular incidents of use or misuse of property to distinct
injuries and submit jury questions to elicit findings attributing
particular injuries to specific acts of negligence. This she did
not do and probably could not have done given the apparent nature
of her injury. Because of the indivisible nature of Ms. Petty's
injury and the absence of any attempt by her counsel to obtain jury
findings linking particular negligent acts or omissions with
distinct injuries, we hold the trial court properly limited Ms.
Petty's recovery to $250,000 in accordance with § 101.023 of the
Act. 

 We overrule Ms. Petty's first cross-point of error.


CONSTITUTIONAL CHALLENGES


 In her second cross-point of error, Ms. Petty asserts the
trial court violated the open-courts provision and equal-protection
clause of the state constitution by limiting Ms. Petty's damages to
$250,000. See Tex. Const. Ann. art. I, §§ 3, 13 (1984).

Open Courts


 The open-courts provision of the State Constitution
ensures that those bringing common-law causes of action will not be
denied unreasonably a right to redress for their injuries. Hanks
v. City of Port Arthur, 48 S.W.2d 944, 946 (Tex. 1932). To
establish that a statute violates the open-courts provision, a
plaintiff must show that (1) she has a "cognizable common law cause
of action that is being restricted" and (2) the restriction is
unreasonable or arbitrary when balanced against the purpose of the
statute. Lucas v. U.S., 757 S.W.2d 687, 690 (Tex. 1988); Sax v.
Votteler, 648 S.W.2d 661, 666 (Tex. 1983). 

 In the present case, Ms. Petty cannot meet the first
element of the Sax test because she cannot show a "cognizable
common law cause of action." Hers is purely a creature of statute
which exists solely by virtue of the Act. See Rose v. Doctors
Hosp., 801 S.W.2d 841, 845 (Tex. 1990); Tarrant Cty. Water Control
v. Crossland, 781 S.W.2d 427, 439 (Tex. App. 1989, writ denied);
Tarrant County Hosp. Dist. v. Ray, 712 S.W.2d 271, 273 (Tex. App.
1986, writ ref'd n.r.e.). We therefore hold that the damages limit
of § 101.023 of the Act does not violate the open-courts provision
of Art. I § 13 of the state constitution.

Equal Protection


 Ms. Petty also argues that the damages limit of § 101.023
violates her right to equal protection under Tex. Const. Ann. art.
I, § 3 (1984), because it allows full compensation for plaintiffs
injured by negligent acts or omissions of state employees where
damages amount to $250,000 or less, but permits those suffering
damages greater than $250,000 only partial compensation for their
injuries. She argues in substance that the Legislature could not
fix any such dividing line and was obliged to waive immunity as to
all sums or none at all to satisfy the equal-protection
requirement. We reject the theory.

 When neither a "suspect classification" nor interference
with a "fundamental right" is involved, we must sustain a
challenged statutory classification if it is "rationally related to
a legitimate state interest." See Spring Branch I.S.D. v. Stamos,
695 S.W.2d 556, 559 (Tex. 1985), appeal dism'd, 475 U.S. 1001
(1986). The purpose behind the damages cap in the Act is to
"preserve governmental funds." Tarrant County Hosp. Dist., 712
S.W.2d at 273.

 We cannot say that the limitation on damages recoverable
from the state is "wholly irrelevant to" the legislative goal of
"preserving governmental funds." See McGowan v. Maryland, 366 U.S.
420, 425 (1961); Mass. Indem. & Life v. Tex. State Bd. of Ins., 685
S.W.2d 104, 110 (Tex. App. 1985, no writ). We therefore decline to
hold that there is no rational relation between the discrimination
in the Act among plaintiffs based on the amount of their claims
and the legitimate legislative goal of preserving state funds.

 We overrule Ms. Petty's second cross-point of error.



PRE-JUDGMENT INTEREST



 In her third cross-point of error, Ms. Petty contends the
trial court erred by refusing to add pre-judgment interest to her
damages award. 

 The Supreme Court of Texas has held that the Act
prohibits the award of pre-judgment interest in a suit against the
state if the addition of such interest to the damages award would
result in a recovery in excess of the maximum allowed by § 101.023
of the Act. See Weller v. State, 682 S.W.2d 234 (Tex. 1984). Ms.
Petty argues that the enactment of Tex. Rev. Civ. Stat. Ann. art.
5069-1.05, § 6(a) (Supp. 1991), which provides that "[j]udgments in
wrongful death, personal injury, and property damage cases must
include prejudgment interest," renders Weller obsolete, as the
holding in Weller depended on the fact that the plaintiff in that
case "had no statutory right to prejudgment interest, but rather
sought such interest as an element of damages under common law." 
Weller, 682 S.W.2d at 234. With the enactment of art. 5069-1.05
§ 6(a), Ms. Petty contends, she acquired a statutory right to pre-judgment interest, and therefore neither Weller nor § 101.023 is a
bar to her recovery of pre-judgment interest. We disagree.

 Because suits against the State are generally barred by
governmental immunity, Ms. Petty's cause of action existed solely
by virtue of § 101.021 of the Act. See City of Austin v. Cooksey,
570 S.W.2d 386, 387 (Tex. 1978). As a condition of its waiver of
immunity under the Act, the legislature limited the State's
liability to $250,000 per person per occurrence. Ms. Petty
therefore had no "statutory right" to any recovery in excess of
this limit.

 Ms. Petty rejoins by the following theory. She states in
her brief that "damages" consist in "the sum of money the law
awards as pecuniary compensation . . . for an injury done or a
wrong sustained as a consequence of either a breach of a
contractual obligation or a tortious act," citing McRae v. Lindale
Independent School District, 450 S.W.2d 118, 124 (Tex. Civ. App.
1970, writ ref'd n.r.e.). Consequently, merely adding pre-judgment
interest to the maximum "damages" allowed by the Act would not be
an addition of "damages," but another sum derived from multiplying
"damages" by an interest rate in calculating "the compensation
allowed by law for the . . . detention of money." Tex. Rev. Civ.
Stat. Ann. art 5069-1.01(a) (1987).

 The theory is misconceived. Strictly speaking,
"interest" is a misnomer when used in reference to pre-judgment
"interest." The word "interest" is employed only for convenience
in speaking of "an element of damages necessary to the complete
indemnity of the injured party." Watkins v. Junker, 40 S.W. 11
(Tex. 1897), overruled on other grounds, Cavnar v. Quality Control
Parking, Inc., 696 S.W.2d 549, 553-54 (Tex. 1985). (Emphasis
added). 

 We hold the trial court did not err in refusing to award
pre-judgment interest in addition to Ms. Petty's recovery of the
maximum amount allowed by the Act. See Weller, 682 S.W.2d at 234;
Dept. of Hwys. & Public Transp. v. Bacon, 754 S.W.2d 279, 282 (Tex.
App. 1988, writ denied).

 In consequence, we overrule Ms. Petty's third cross-point
of error.

 We therefore affirm the trial-court judgment. Because we
affirm the trial-court judgment, we need not address Ms. Petty's
"contingent" cross-points of error.


 
 John E. Powers, Justice


[Before Justices Powers, Aboussie and Kidd]

Affirmed

Filed: August 28, 1991

[Publish]


FOOTNOTES




[1] According to Ms. Petty's expert witness, Dr. Jefferson Nelson,
schizophrenia is a severe mental disorder that affects
thinking, perception, and interpersonal functioning. Symptoms
include auditory hallucinations, false beliefs that are not
alterable even in the face of reasonable evidence to the
contrary, and an inability to express emotion and feeling.
"Hebephrenic schizophrenia" is a "particularly disorganized
form of schizophrenia," and a patient with the disease may
not be able to communicate with others at all, as her speech
may be incoherent and her thoughts may leap from one thing to
another in no organized fashion.


[2] An important corollary of immunity from liability is that the
state is generally not liable for the torts of its employees. 
See Lowe v. Texas Tech University, 540 S.W.2d 297, 298 (Tex.
1976); Dillard v. Austin Indep. School Dist., 806 S.W.2d 589,
592 (Tex. App. 1991, writ requested). For a general discussion
of sovereign immunity, see Greenhill and Murto, Governmental
Immunity, 49 Texas L. Rev. 462 (1971). 


[3] These included the Slossin, WAIS, and Stanford-Binet tests,
all verbally administered "I.Q." tests, and the Wide Range
Achievement Text, a written examination designed to measure
levels of achievement in reading, spelling, and mathematics. 
We do not understand the Robinson analogy insofar as these
tests are concerned, and the Department offers no further
explanation except as stated above.


[4] We are aware that the cryptic language of § 101.021 has
resulted in conflicting opinions in the courts of appeal
regarding what constitutes tangible property within the
meaning of § 101.021. See, e.g., City of Houston v. Arney,
680 S.W.2d 867, 874 (Tex. App. 1984, no writ) (Plaintiff who
had hysterectomy because clinic personnel failed to inform her
that pap smear results were positive stated a cause of action
within the Act by alleging injury resulting from the negligent
"keeping of files, records or other documentation and means of
notification, a use or condition of tangible personal
property."). Cf. Robinson, 727 S.W.2d at 43 (Protective order
held not to be tangible property within meaning of the Act.);
Montoya v. John Peter Smith Hosp., 760 S.W.2d 361, 364 (Tex.
App. 1988, writ denied) (In dicta, the court stated that a
blank triage slip did not constitute tangible property under
the Act.).


 Definitions provided in judicial opinions are of little
assistance: Several courts have defined "tangible property"
as "property that is capable of being handled, touched, or
seen." See Robinson, 727 S.W.2d at 43; Lay v. Aetna Ins. Co.,
599 S.W.2d 684, 686 (Tex. Civ. App. 1980, writ ref'd n.r.e.).


[5] Unlike the electrocardiograph in Salcedo, the "blank" tests do
not reflect the condition of the patient. Rather, they
resemble more closely the blank triage slips in Montoya. 760
S.W.2d at 364.


[6] We note that, unlike the Restatement Second of Torts, Texas
law places the burden of proving the unlawfulness of the
confinement on the plaintiff, rather than allowing the
defendant to raise legality as an affirmative defense. See
Restatement Second of Torts § 35, at 52 (1965).


FOOTNOTES (Cont'd.)




[7] The Department avers that the broad form of the pleadings and
the jury questions, together with the nature of the proof
adduced, required the Department to defend against multiple
incidents from which the jury could have inferred negligence. 
We disagree. The test under Tex. R. Civ. P. Ann. 45(b)(Supp.
1991) for adequacy of the pleadings is whether the pleading
gives the defendant fair notice of the claim against it. See
also 2 McDonald, Texas Civil Practice, § 5.05, at 10-16 (rev.
ed. 1982), citing Andrews v. Daniel, 240 S.W.2d 1018, 1020
(Tex. Civ. App. 1951, writ dism'd). Fair notice has been
given if "the pleadings are sufficiently specific that
'. . . an opposing attorney of reasonable competence, with the
pleadings before him, can ascertain the nature and the basic
issues of the controversy and the testimony probably
relevant.'" Rodriguez v. Yenawine, 556 S.W.2d 410, 414 (Tex.
Civ. App. 1977, no writ), citing, 2 McDonald, § 5.05, at 13.


 Furthermore, in ruling on the adequacy of pleadings, a judge
must bear in mind "the positions of the parties and such
pertinent factors as their means of knowledge of the facts and
access to the necessary evidence." 2 Mc Donald, § 5.05, at 12. 
In the present case, Ms. Petty made numerous factual
allegations regarding which acts she claimed were negligent. 
For example, Ms. Petty alleged Department personnel


 

 subjected [her] to continuing wrongful restraint
and continuing lack of minimally adequate
treatment, training, and habilitation because of
which Ms. Petty never developed those skills which
she would have developed had she not been
institutionalized. Defendants, their employees and
those acting in concert with them or at their
direction, prevented Opal Petty from realizing her
developmental potential and thus proximately caused
her serious adverse functional development.



 Ms. Petty rather specifically described the nature of her
injury in the portion of her petition labeled "Sixth Cause of
Action (Negligence)" as the


 

 loss of liberty and good health, serious and
aggravated on-going regression in intellectual and
daily living skills, and lost opportunities to
develop those skills which she would have otherwise
developed but for her confinement and which are

 necessary to live outside of an institution without
supervision, all as a direct result of the
negligent acts of Defendant TDMHMR's employees. 
Those acts included the negligent use and misuse of
tangible personal or real property, as well as the
negligent supervision of the use of such personal
or real property. [The petition then enumerates
specific items of property allegedly used.] 



FOOTNOTES (Cont'd.)




[7] Continued:


 Given the Department's superior ability to ascertain
information about the names of specific Department employees
and specific acts of negligence and the fact that Ms. Petty's
ability to ascertain the existence of specific instances of
negligent conduct and the identities of particular employees
depended on the record-keeping of the defendant, we do not
believe Ms. Petty's pleadings were lacking in specificity or
in any way failed to give the Department fair notice of the
claims against it.


[8] The Department also offered evidence that Ms. Petty's foster-care provider receives $8.35 per day from the Center and 
testimony by the Director of Mental Retardation Services at
the Concho Valley Center stating the Center expended an
estimated $21,424.88 on Ms. Petty's care from December 1985
through August 1988 for case-management services; workshop
services; psychological, medical, and dental consultants; and
a comprehensive diagnostic and evaluation assessment.


[9] Acts which are expressly or impliedly authorized by law cannot
be made the basis of a claim for damages. Farnsworth v.
Massey, 365 S.W.2d 1, 5 (Tex. 1963). Presumably, the payments
to the Concho Valley Center were lawful; the Department does
not contend otherwise.